UNITED STATES DISTRICT COURT

DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CHARLES ZIMMERMAN, Derivatively on behalf of CONAGRA FOODS, INC., | ) ) ) | No. |
| Plaintiff, | ) ) | VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, |
| vs. | ) ) ) | ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST |
| JAMES P. O'DONNELL, BRUCE ROHDE, FRANK S. SKLARSKY, MOGENS C. BAY, STEPHEN G. BUTLER, ALICE B. HAYES, W.G. JURGENSEN, CARL E. REICHARDT, DAVID H. BATCHELDER, HOWARD G. BUFFETT, MARK H. RAUENHORST, JOHN T. CHAIN, JR., RONALD W. ROSKENS, KENNETH E. STINSON, STEVEN F. GOLDSTONE and ROBERT KRANE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ENRICHMENT AND VIOLATIONS OF THE SARBANES-OXLEY ACT OF 2002 DEMAND FOR JURY TRIAL |
| Defendants. | ) ) ) | |
| -and- | ) ) | |
| CONGRA FOODS, INC., a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | |

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of ConAgra Foods, Inc. ("ConAgra" or the "Company"), a Delaware corporation, with its headquarters in Omaha, Nebraska, on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of the Sarbanes-Oxley Act of 2002 that occurred between September 2003 and the present (the "Relevant Period") These breaches of fiduciary duty and violations of law have caused ConAgra to suffer damages, as alleged herein.

## SUMMARY OF THE ACTION

2.      ConAgra is a packaged food company serving a wide variety of food customers.  The Company's operations are classified into three segments: Retail Products, Foodservice Products and Food Ingredients.

3.      Despite a fairly mundane business product – food , over the past eight years the Company has not been able to report a single year of accurate financial results.  The trouble for ConAgra started in June 2001.  That is when ConAgra announced that it was restating earnings in connection with its United Agri Products, Inc. ("UAP") unit for fiscal years ("FY") 1997-2001.  The Company also announced in 2001 that it was the target of a Securities and Exchange Commission ("SEC") probe into the Company's financial reporting practices. The SEC ultimately concluded that ConAgra's accounting in its UAP unit was materially false and fined the Company $46.5 million.

4.      Anxious to convince the market and investors that its problems were behind it, ConAgra instituted certain corporate governance policies in 2002.  For example, on September 19,

2002, defendant Bruce Rohde ("Rohde") touted the Company's governance policies during a conference call with analysts:

> If you look at our governance principles, they are also posted on our Web site. I encourage you to read them there or in the annual report. We want everyone to know about the main items that set us apart from other companies. Not giving loans to directors or executive directors, not repricing options, restricting executives and officers to not selling stock until six months after leaving the company.
>
> Those are the kinds of things that align management with shareholders and it is the antithesis with the many practices that are under debate in the business world today. These don't pertain to this quarter, they pertain to how we run this company. We can't impact how other companies operate, but we can impact how we run this one.

5. The Company's corporate governance policies created the appearance that Company insiders would no longer have any incentive to manipulate the Company's financials. In fact, the financials were false. In recent years, ConAgra had sold assets for approximately $3.8 billion - well exceeding the assets' book value of $3.1 billion, thereby creating a net profit of $700 million. Defendants then minimized income taxes paid, which maximized the personal bonuses paid to Rohde. The scheme to reduce income taxes paid was based on faulty book values and false entries made in determining proper foreign tax credits, all of which was related to the assets at issue.

6. Since Rohde and fellow executives were prohibited by the Company's internal corporate governance rules from selling their own ConAgra shares, Rohde manufactured a scheme to reap ill-gotten monies. The plan would involve manufacturing earnings to create bonuses for himself.

7. For his role in the tax scheme, defendant Rohde rewarded himself handsomely. Rohde cashed in on the tax scheme for $17.5 million. For FY:02, Rohde received $3 million plus

restricted stock and options valued near $3 million. In FY:03, he received a bonus of nearly $5 million and in FY:04, he received $6.5 million. Rohde was paid bonuses based on the appearance of growing net income. ConAgra, through its officials subsequently admitted company net income was materially overstated due to the understatement of tax payments in FY:04 and FY:03 that initially were estimated at between $150 million to $200 million - the equivalent of $0.20 per share annually or between 10% and 15% of earnings. While ConAgra was in the process of restating earnings for both years, Rohde announced he would step down as Chief Executive Officer ("CEO"). There were calls made for the Company to restate Rohde's bonus given the circumstances under which he was paid.

8.     To ensure his tax scheme would not be detected by the accounting department, Rohde structured the tax and accounting departments in a way that he could fully control the flow of information relating to the $100 million-plus foreign tax scheme which boosted – if not created – Rohde's bonuses totaling $17.5 million. Instead of allowing the tax department to report to the CFO and the accounting department where the foreign tax scheme would be red flagged – if not halted altogether – the tax department did not report to the CFO.

9.     Shareholders were stunned by alarming news when spokespersons for the Company admitted to an analyst the "tax accounting department" did not report to the CFO. Rather, it seemed that Rohde was "acting as CFO" over the tax department. The tax accounting department was the very department that created this $150 to $200 million overstatement – nearly the equivalent of 12% of the $1.65 billion the Company reported over this two-year period. When the restatement was ultimately announced, it was reported that FY-03 earnings (ConAgra's fiscal year ended on the last Sunday of May) had been overstated by $11 million, or $0.03 per share, FY-04 earnings were

3

overstated by $68.6 million or $0.13 per share, and first half FY:05 earnings were overstated by $3 million or $0.01 per share. The Company's FY:02 results were also misstated due to this tax issue. Thus, *during the past eight years,* the Company's accounting was erroneous and it issued inaccurate financial statements, With this news, the Company's shares dropped to the $26 range on news of the accounting misstatement from the $27-$28 range prior to this news, causing the Company to lose $3.5 billion in market capitalization.

    10.    Then, on June 7, 2005, the defendants caused or allowed the Company to issue a press release entitled "ConAgra Foods Comments on Fiscal 2005 Fourth Quarter and Cost-Savings Initiatives." The press release stated in part:

> Today ConAgra Foods commented on earnings for the fiscal 2005 fourth quarter, which ended May 29, 2005, as well as recent developments in its cost-savings initiatives.
>
> **Fourth Quarter**
>
> Earnings for the company's fiscal 2005 fourth quarter will be lower than expected primarily due to continued weak profitability in the packaged meats operations. Those operations continue to be negatively impacted by high protein input costs coupled with inadequate pricing management.
>
> • In its preliminary third quarter earnings release on March 24, 2005, the company indicated that it expected fourth-quarter EPS to modestly exceed third-quarter EPS, excluding items that impact comparability.
>
> • Third-quarter diluted EPS of $0.32 included net $0.02 per share of expense from items that impact comparability.
>
> • Because the expected improvement in the packaged meats business did not materialize, contribution from the packaged meats operations in the fourth quarter will be in the range of $0.10 per share lower than the company expected when it made previous comments regarding the fourth quarter. The company is not providing a specific fourth-quarter performance number at this time because the results are not yet final; however, the company suggests third parties with estimates of fourth quarter performance, which exclude

4

items that impact comparability, should lower their estimates by an amount similar to the earnings shortfall in the packaged meats operations. Items that impact comparability will include severance charges associated with cost-savings initiatives as discussed later in this document.

The company previously expected aggressive pricing management to improve packaged meats results in the fourth quarter. The pricing actions that were taken were inadequate and were not executed to expectations. The company has recently made several significant personnel changes in its packaged meats operations and expects those changes, along with better pricing management, aggressive cost-savings initiatives, and SKU rationalization, to improve the packaged meat operations over time.

Bruce Rohde, chairman and chief executive officer, commented, "Our fiscal 2005 showed a solid first-half performance, followed by a weak second-half performance largely due to the challenges in our packaged meats business across retail, foodservice, and deli channels. Weak pricing execution negatively impacted our third quarter and continued in the fourth quarter. Our focus is on improving the packaged meat operations with new leadership team members, appropriate pricing, SKU reductions, and more efficient operations."

11.     On this news, ConAgra's stock collapsed to $24.32 per share.

## JURISDICTION AND VENUE

12.     This court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that plaintiff's claims arise in part out of the laws of the United States, including the Sarbanes-Oxley Act of 2002.

13.     This Court has jurisdiction over all claims asserted pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiffs and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

5

14.     Venue is proper in this District Court pursuant to 28 U.S.C. §1391(a) because (a) one or more of the defendants either resides in or maintains executive offices in this District (b) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owned to ConAgra occurred in this District, and (c) defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

15.     Plaintiff Charles Zimmerman is, and was at times relevant hereto, an owner and holder of ConAgra common stock.  Plaintiff is a citizen of New Jersey.

16.     Nominal defendant ConAgra is a corporation organized and under the laws of Delaware, with its principal place of business located at One ConAgra Drive, Omaha, Nebraska. ConAgra is a packaged food company serving a wide variety of food customers.  The Company's operations are classified into three segments: Retail Products, Foodservice Products  and Food Ingredients.  All segments are headquartered at Omaha, Nebraska.

17.     Defendant Rohde was, throughout the Relevant Period, Chairman, President, CEO and a director of ConAgra.  Because of Rohde's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period.  Rohde was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the

6

Relevant Period, Rohde participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. For FY:04 and FY:03, ConAgra paid defendant Rohde $7,861,751 and $5,948,938, respectively, in salary, bonus, restricted stock awards, LTIP payouts and other compensation. Defendant Rohde is a citizen of Nebraska.

18.     Defendant James P. O'Donnell ("O'Donnell") was until June 2004 Executive Vice President and CFO of ConAgra. Because of O'Donnell's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. O'Donnell was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, O'Donnell participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. For FY:04 and FY:03, ConAgra paid defendant O'Donnell $2,184,753 and $1,854,735, respectively, in salary, bonus restricted stock awards, LTIP payouts and other compensation. Defendant O'Donnell is a citizen of Arizona.

19.     Defendant Frank S. Sklarsky ("Sklarsky") has been Executive Vice President and CFO of ConAgra since December 2004. Because of Sklarsky's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Sklarsky was aware of this information via his access to internal corporate documents, conversations and

7

connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Sklarsky participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Under Sklarsky's employment agreement with the Company, he expects to receive an annual salary of $500,000, along with uncapped annual incentive compensation targeted at 100% of his annual salary. Further, Sklarsky received a one-time grant of 50,000 restricted shares of ConAgra stock and a $350,000 sign on bonus when he was hired. Defendant Sklarsky is a citizen of Nebraska.

20.     Defendant Mogens C. Bay ("Bay") was, throughout the Relevant Period, a director of ConAgra. Because of Bay's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Bay was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Bay participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Defendant Bay is a citizen of Montana.

21.     Defendant Stephen G. Butler ("Butler") was, throughout the Relevant Period, a director of ConAgra. Because of Butler's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and

8

misleading financial information throughout the Relevant Period. Butler was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Butler participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Upon information and belief, Butler is a citizen of New York.

22. Defendant Alice B. Hayes ("Hayes") was, throughout the Relevant Period, a director of ConAgra. Because of Hayes positions with the Company, she knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Hayes was aware of this information via her access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Hayes participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Defendant Hayes is a citizen of Illinois.

23. Defendant W.G. Jurgensen ("Jurgensen") was, throughout the Relevant Period, a director of ConAgra. Because of Jurgensen's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Jurgensen was aware of this information via his access to internal corporate documents, conversations and connections with other

corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Jurgensen participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Defendant Jurgensen is a citizen of Ohio.

24.     Defendant Carl E. Reichardt ("Reichardt") was, throughout the Relevant Period, a director of ConAgra. Because of Reichardt's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Reichardt was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Reichardt participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Defendant Reichardt is a citizen of California.

25.     Defendant David H. Batchelder ("Batchelder") was, throughout the Relevant Period, a director of ConAgra. Because of Batchelder's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Batchelder was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the

Relevant Period, Batchelder participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  Defendant Batchelder is a citizen of California.

26.     Defendant Howard G. Buffett ("Buffett") was, throughout the Relevant Period, a director of ConAgra.  Because of Buffet's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period.  Buffet was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Buffet participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  Defendant Buffett is a citizen of Illinois.

27.     Defendant Mark H. Rauenhorst ("Rauenhorst") was, throughout the Relevant Period, a director of ConAgra.  Because of Rauenhorst's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period.  Rauenhorst was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Rauenhorst participated in the issuance of false and/or misleading statements,

11

including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Defendant Rauenhorst is a citizen of Minnesota.

28.     Defendant John T. Chain, Jr. ("Chain") was, throughout the Relevant Period, a director of ConAgra. Because of Chain's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Chain was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Chain participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Defendant Chain is a citizen of Colorado.

29.     Defendant Ronald W. Roskins ("Roskins") was, throughout the Relevant Period, a director of ConAgra. Because of Roskins' positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Roskins was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Roskins participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Defendant Roskins is a citizen of Nebraska.

12

30.     Defendant Kenneth E. Stinson ("Stinson") was, throughout the Relevant Period, a director of ConAgra.  Because of Stinson's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period.  Stinson was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Stinson participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  Defendant Stinson is a citizen of Nebraska.

31.     Defendant Steven F. Goldstone ("Goldstone") was, throughout the Relevant Period, a director of ConAgra.  Because of Goldstone's positions with the Company, he knew material, adverse non-public information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period.  Goldstone was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Goldstone participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  Defendant Goldstone is a citizen of Connecticut.

32.     Defendant Robert Krane ("Krane") was, throughout the Relevant Period, a director of ConAgra.  Because of Krane's positions with the Company, he knew material, adverse non-public

13

information regarding ConAgra and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Krane was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Krane participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Defendant Krane is a citizen of Colorado.

33.     The defendants identified in ¶¶17, 20-32 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶17-19 are referred to herein as the "Officer Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants."

## BACKGROUND

34.     During 2001, the Company drew SEC attention and was forced to restate earnings for the previous three years due to accounting improprieties in its UAP division. In 2002, the USDA forced ConAgra to recall 19 million pounds of ground beef because of possible "e.coli" contamination, making it the second-largest food recall in U.S. history.

35.     Anxious to convince the market that these problems were behind it, ConAgra instituted certain corporate governance policies in 2002. For example, on the September 19, 2002 conference call, defendant Rohde stated:

> And we talk about how we see some of the issues being discussed now, like options and pensions and also our culture and governance practices. We did this because governance items are top of mind for a lot of folks today and they should be.

14

If you look at our governance principles, they are also posted on our Web site. I encourage you to read them there or in the annual report. We want everyone to know about the main items that set us apart from other companies. Not giving loans to directors or executive directors, not repricing options, restricting executives and officers to not selling stock until six months after leaving the company.

Those are the kinds of things that align management with shareholders and it is the antithesis with the many practices that are under debate in the business world today. These don't pertain to this quarter, they pertain to how we run this company. We can't impact how other companies operate, but we can impact how we run this one.

With that in mind I look forward to strong EPS this year. You heard me say this before. We are on the journey to become America's favorite food company, focused on and interested in the branded and value added side of the business. Doing that through portfolio changes and operating improvements. You saw this start to take shape over the last several quarters. You will like the steady progress that should unfold as we move forward.

36.     The Company's corporate governance policies created the appearance that with the restrictions on share sales, there would be no incentive to manipulate the Company's financials. However, this new corporate governance policy failed to take into account the huge bonuses and other incentive compensation being paid to ConAgra's executive.

Sound corporate governance practices are an important part of our foundation and tradition. We have many longstanding policies and practices, and we have also added measures to further strengthen our foundation. Our corporate governance practices include the following:

●     Other than our Chief Executive Officer, none of our directors are, or ever have been, employed by the Company.

●     *Directors and executive officers are committed to owning stock in ConAgra Foods, and as part of that commitment they will not sell any of their ConAgra Foods stock until at least six months after they cease to be a director or an executive officer except for extraordinary corporate transactions approved by the board and for emergency or extraordinary situations with 2/3 board approval.*

15

37.     Although the Audit Committee, consisting of defendants Butler, Bay, Jurgensen and Stinson, was responsible for reviewing the integrity of the financial statements of the Company, eight out of the past eight years, they were false.  Defendant Rohde had hand picked most of the Audit Committee members and, since they had a long track record of allowing him – if not assisting him – in his misdeeds, his scheme to reap ill-gotten bonuses would be, like his earlier ones, free of barriers from the Company's Audit Committee.  During the Relevant Period, the Audit Committee was responsible for reviewing the Company's annual audited  financial statements, quarterly financial statements and filings with SEC, together with critical accounting policies of the Company, significant changes in the Company's selection or application of accounting principles and the Company's internal control processes.  The members of the Audit Committee received extra compensation for serving on this committee.  Each and every member claimed they were capable of performing the required tasks.

38.     Notwithstanding these changes to the Company's insider selling policy, defendant Rohde continued to receive lucrative benefits based on the short-term illusion of favorable earnings growth.  His salary increased from the $950,000 range to the $1.2 million range and his bonus was increased from the $2.4 million range to the $3.5 million range.  Rohde also began, in 2002, receiving restricted stock awards of $1.9 million.  By 2004, these awards grew to $2.9 million per year.

39.     Thus, despite restrictions on selling his stock, Rohde was still highly compensated and able to benefit from the misstatements alleged herein.

40.     Prior to the Relevant Period, ConAgra reported its FY:03 results, which were overstated by $11 million, or $0.02 per share due to the Company's improper accounting for taxes.

The Company misstated financials were alive and uncorrected at the beginning of the Relevant Period.

## IMPROPER STATEMENTS
## DURING THE RELEVANT PERIOD

41.     On September 18, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "ConAgra Foods Reports First-Quarter Results, Expect Solid Earnings Performance for Fiscal 2004."  The press release stated in part:

> Today ConAgra Foods, Inc., one of America's leading packaged food companies, reported first quarter diluted EPS of $0.37 for the quarter ended Aug. 24, 2003, compared with $0.43 last fiscal year.  As expected, the company's first-quarter sales and EPS were below last year, reflecting strategic divestitures completed during fiscal 2003.  Sales were $4.4 billion compared with $6.6 billion last year, following the divestiture of the fresh beef, pork, canned seafood, and cheese businesses.  Net income was $195 million compared with $228 million last fiscal year.

> Bruce Rohde, chairman and chief executive officer, commented, "We've made a significant and deliberate transformation of our portfolio to have a higher-quality mix of businesses.  Our first quarter is typically one of the lightest of our fiscal year, and, because of that and divestitures, we planned for this fiscal year's first-quarter sales and earnings to be below last year's.  However, with our improved business mix, we expect a solid earnings performance for the full fiscal year.  We have focused our resources on profit-enhancing initiatives in the areas of brand building, sales and marketing execution, customer service capabilities, and cost-savings programs.  Our businesses have identified and are aggressively pursuing cost-saving opportunities to reduce complexity, improve efficiency, and drive solid earnings performance.  The target is improved overall margins, better turns on invested capital, and a solid earnings performance this fiscal year and next."

> **Packaged Foods**

> Packaged Foods segment sales were $2.7 billion, compared with $2.9 billion last year.  The year-over-year sales decrease reflects the divestiture of the canned seafood and cheese processing operations.  During the quarter, sales grew for many key categories and brands, including frozen meals (Banquet, Healthy Choice, and Kid Cuisine), canned pasta (Chef Boyardee), tomato products (Hunt's), whipped toppings (Reddi-wip), and cooking spray (PAM), dinner kits (Banquet Homestyle Bakes), liquid eggs (Egg Beaters), meat snacks (Slim Jim and Pemmican), chili (Wolf), oil

(Wesson), sausages (Eckrich and Brown 'N Serve), and others. Some brands that did not post sales gains for the quarter include Armour, Blue Bonnet, Butterball, Marie Callendar's, Orville Redenbacker's, and Van Camp's. The company is particularly encouraged by favorable results for some of its large frozen brands. During the quarter, the company invested in new branded retail products in frozen meals, shelf-stable meals, snacks, and dessert categories as part of a plan to fuel profitable future growth. Overall sales for the company's foodservice operations declined slightly for the quarter, primarily in processed and specialty meats, but some key product lines showed sales growth and the industry is showing positive signs in certain segments. Volumes for deli customers grew while volumes for retail and foodservice customers declined. Marketing mix improved during the quarter as part of an ongoing program to target a greater percentage of marketing resources toward consumer connections and usage.

*   *   *

**Interest, Corporate Expense, Depreciation & Capital Expenditures From Continuing Operations**

Net interest expense for the quarter was $66 million compared with $84 million the prior year. Capital expenditures totaled $78 million compared with $91 million last year. Depreciation and amortization expense was approximately $91 million for the quarter versus $108 million a year ago. Dividends paid were $131 million compared with $124 million. Corporate expense was $92 million compared with $67 million last year – the increase largely reflects the resolution of litigation described below.

Rohde concluded. "We have been progressively reshaping the company toward a richer business mix and building customer-focused resources. Our goal is to become America's Favorite Food Company with a portfolio of favorite products for grocery, restaurant, and ingredient customers, supported by superior customer service capabilities. *We continue to make important changes to our portfolio of businesses so that all of our resources are strategically aligned with our goals to profitably and efficiently serve customers. We look forward to reporting on our progress.*"

42.     On December 22, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "ConAgra Foods Reports Strong Second-Quarter and Fist-Half EPS; Strategic Portfolio Changes Complete, Share Repurchase Program Authorized." The press release stated in part:

18

Today ConAgra Foods, Inc., home of many of America's favorite food brands, reported diluted EPS of $0.51 for the second quarter ended Nov. 23, 2003, compared with $0.44 last fiscal year.  Current quarter earnings of $0.51 per diluted share include a charge of approximately $0.04 per share related to the discontinued operations of UAP.  Diluted EPS from continuing operations increased 18% for the quarter.

Sales for the company's fiscal second quarter were $3.9 billion, $578 million less than last year; operating profit was $501 million for the second quarter, $5 million less than last year.  The sales and operating profit comparisons reflect the strategic divestiture of non-core businesses during the prior fiscal year.  Sales and operating results for current and prior year reflect the reclassification of chicken processing and UAP as discontinued operations.

Bruce Rohde, chairman and chief executive officer commented, "Our team's accomplishments this fiscal year have been significant.  As planned, we completed the strategic reshaping of the company by divesting our last two significant non-core businesses–chicken processing and UAP.  ConAgra Foods is well positioned for the future, and our focus is on creating shareholder value through improved profit margins and returns on capital with branded and value-added food products as we build America's Favorite Food Company.  As part of our plan to re-deploy capital, we recently announced a $1 billion share repurchase program, to complete an efficient reallocation of resources."

He continued, ***"Our overall EPS results in the second quarter and first half were solid and on target.  Overall operating trends for the second half of 2004 are expected to show strength, driven by a strong fourth-quarter performance, due to operations improvements within our supply chain and administrative functions, and also favorably impacted by marketing initiatives we have underway."***

\*   \*   \*

**Operating Efficiency Initiatives**

***The company has operating efficiency initiatives underway that are intended to improve the company's cost structure, margins, and competitive position.  Implementing these initiatives resulted in approximately $0.01 per diluted share charge in the current quarter, and is expected to result in $0.05-$0.10 per diluted share of charges in the second half of 2004.  The company will identify those expenses as such in its future earnings releases.***

**Packaged Foods**

Packaged Foods sales and operating profit for the quarter increased year-over-year, excluding $154 million of sales and $15 million of operating profit from divested businesses in prior year amounts . . . .

\*   \*   \*

The company has undertaken specific top-line growth initiatives which include product quality and packaging improvements, new product introductions, marketing mix and marketing efficiency improvements, as well as a unified sales force and product bundling programs.  As noted earlier, the company also has significant cost-saving and efficiency initiatives underway which involve procurement, manufacturing, transportation, warehousing, administrative, and other functions.  The company plans for those cost-savings initiatives to favorably impact future Packaged Foods operating profit.

\*   \*   \*

**Portfolio Reshaping Completion & Share Repurchase Program**

On Nov. 23, the company completed a multi-year portfolio reshaping program to focus on branded, value-added foods.  On that day, the company sold its last two significant non-core businesses – chicken processing and UAP – and subsequently received more than $800 million of cash from those transactions.

Shortly after the close of those transactions, the company announced a $1 billion share repurchase program as part of its strong capital allocation discipline.  The $1 billion share repurchase program begins on or after Dec. 22, 2003, and equates to approximately 40 million shares at recent market prices, which represents close to 7% of the company's existing common stock.

**Outlook**

*Bruce Rohde continued, "We are confident that our efficiency-enhancing and to-line growth initiatives will result in a solid operating performance in the second half of fiscal 2004, driven by a strong fourth-quarter performance.  I look forward to reporting on our progress as we pursue our goal of becoming America's Favorite Food Company in a way that expands operating profit margins, strengthens returns on invested capital, and posts profitable sales growth."*

Regarding the second half of fiscal 2004:

- Based on past experience, the company generally expects its fourth quarter to be a more significant contributor than the third quarter to the company's yearly earnings. In addition, the company expects the fourth quarter to show a higher year-over-year EPS growth rate than the third quarter, reflecting the fact that charges were incurred in the fourth quarter of last fiscal year related to divesting the chicken processing operations.

43. On March 25, 2004, the Individual Defendants caused or allowed the Company to

issue a press release entitled "ConAgra Foods Reports Solid Third-Quarter Earnings with Strong

Sales and Operating Profits." The press release stated in part:

ConAgra Foods, Inc., one of America's leading packaged food companies, today reported earnings of $203 million, or $0.38 per diluted share, for the third quarter ended Feb. 22, 2004; this represents an $0.08 per share increase over last year's earnings of $161 million, or $0.30 per diluted share. Sales were $3.6 billion, essentially equal with last year; on a comparable basis, sales were 4% ahead of last year after adjusting for $155 million of sales from divested businesses in last year's results.

Bruce Rohde, chairman and chief executive officer, commented, "This was a very solid quarter. We are particularly encouraged by sales and category share trends for several key brands and products, as well as progress with many customers. We are continuing our focus on top-line growth, mix improvement, and operations initiatives as part of our plan to improve profit margins and returns on capital."

Current quarter operating profit was $451 million, above $446 million last year. On a comparable basis, after adjusting for $24 million of expense in the current quarter related to implementing cost-saving initiatives and $15 million of contribution in last year's results from businesses since divested, operating profit increased 10% over last year.

For the first nine months of fiscal 2004, earnings were $558 million, or $1.26 per diluted share, ahead of $624 million, or $1.18 per diluted share last year. Sales were $10.8 billion, below last year's sales of $13.5 billion due to divestitures. Sales were up 2% on a comparable basis after adjusting for $2.9 billion of sales from divested businesses in prior year results. Year-to-date operating profit totaled $1.3 billion, below $1.4 billion last year. On a comparable basis, operating profit was essentially equal with last year after adjusting for $90 million of profits from divested

21

businesses in prior year results and $38 million of costs in the current year related to implementing cost-saving initiatives.

**Operating Efficiency Initiatives – Costs Reflected In Segment Results**

The company has several operating efficiency initiatives underway that are intended to improve the company's cost structure, margins, and competitive position. Implementing these initiatives resulted in approximately $38 million, or $0.04 per diluted share of expense year-to-date, which includes $24 million, or $0.03 per diluted share, in the third quarter.  Most of those expenses are reflected in the operating profit for the Packaged Foods segment.  The company currently plans for approximately $0.04 per diluted share of similar charges in the fourth quarter, and will report on those expenses in its fourth-quarter earnings release.

**Packaged Foods**

Sales were $3 billion for the quarter, down slightly from last year due to divestitures.  Sales were up 4% year-over-year on a comparable basis, adjusting for $155 million of sales from divested businesses in prior year results.  Sales to all customer channels – retail, foodservice, and deli – posted year-over-year increases for the quarter.

● The company's top 30 customer brands, which represent close to two-thirds of the segment revenues, grew grater than 6% as a group.  Category shares for several brands have improved in recent periods.

● Several major customer brands posted sales gains, including Armour, Banquet, Chef Boyardee, Cook's, Egg Beaters, Hebrew National, Hunt's, Marie Callender's, PAM, Peter Pan, Reddi-wip, Rosarita, Slim Jim, Snack Pack, Swiss Miss, and Wesson, with many of these achieving double-digit sales increases.

● Sales to foodservice customers grew due to increased business with key customers and growth in certain product lines.

Sales growth for the quarter was primarily attributable to marketing strategy and distribution gains for various items, as well as improved sales execution by dedicated sales teams assigned to serving specific customers and higher selling prices for some products necessitated by rising input costs.  Other factors also contributed to sales growth, including the fact that the company's product line includes items that are on trend with a variety of consumer preferences and product platforms such as health and wellness, convenience, carbohydrate-conscious, and snacks.

Segment operating profit for the quarter was $396 million, below the $416 million posted last year. On a comparable basis, operating profit was 5% higher than last year after adjusting for $24 million of expense relating to cost-saving initiatives in the current quarter, as well as $15 million of contribution last year from businesses since divested. Increasing input costs, which were not yet fully offset by higher selling prices for certain of the company's products, affected the rate of profit growth.

As previously announced, the company is implementing customer service and operating efficiency improvement initiatives that result in absorbing incremental expense in the short term but which are being undertaken to provide cost savings and customer service benefits in the future. As a result of progress with these initiatives, the segment incurred $24 million, or $0.03 per diluted share, of expense during the third quarter. The purpose of these cost-saving and customer service improvement initiatives, along with to-line growth programs, is to drive market share, future profit growth, and margin expansion opportunities within this segment.

Year-to-date sales for the Packaged Foods reporting segment reached $8.9 billion, below $9.2 billion last year due to divestitures. Sales were 2% ahead of last year on a comparable basis, adjusting for $461 million of sales from divested businesses in the fiscal 2003 year-to-date amounts. Operating profit was $1.1 billion, below $1.2 billion last year. On a comparable basis, operating profit was 3% below last year, adjusting for $41 million of contribution from divested businesses in the fiscal 2003 year-to-date amounts as well as $31 million of expense this fiscal year related to implementing cost-saving initiatives.

\*   \*   \*

## Capital Resource Management

- The company repurchased approximately 8.3 million shares of common stock during the fiscal third quarter at a total cost of approximately $218 million.

- During the quarter, the company received approximately $25 million for the partial redemption of preferred securities issued by the buyer of UAP as part of that divestiture; as a result, preferred securities of the buyer of UAP owned by ConAgra Foods now total $35 million.

- **Continuing operations–fiscal third quarter:** For the quarter, capital expenditures for property, plant, and equipment totaled $91 million compared with $87 million last year. Depreciation and amortization expense was approximately $89 million for the quarter versus $89 million a year ago. Dividends paid totaled $138 million. Net interest expense for the quarter was $62 million compared with $64 million last year.

- **Continuing operations–year-to-date:** For the first nine months of fiscal year 2003, capital expenditures for property, plant, and equipment were $247 million, compared with $259 million last year. Depreciation and amortization expense amounted to $263 million versus $286 million last year. Dividends paid totaled $400 million. Net interest expense was $196 million, compared with $217 million last fiscal year.

## Change in Accounting

During the quarter, the company adopted Financial Accounting Standards Board interpretation Number 46 (FIN 46), which addresses the accounting for certain entitles including those that lease property to the company. Adopting FIN 46 had no significant impact on the company's income statement. As a result of adopting FIN 46 and thus consolidating certain entities and de-consolidating others, the following balance sheet changes were made:

- Total assets increased by $267 million.

- Total liabilities increased by $269 million, reflecting an increase in interest-bearing debt and other noncurrent liabilities of approximately $444 million, partially offset by a reduction of $175 million in subsidiary preferred securities.

## New Product News

During the quarter, the company introduced its new line of convenient, prepared, carbohydrate-controlled frozen meals, Life Choice, which was designed for consumers who prefer tasty and filling products that have fewer carbohydrates. ConAgra Foods is the first major food manufacturer to market a new and complete line of great-testing frozen meals designed specifically for carbohydrate-conscious consumers. As of today, Life Choice has achieved national availability after being introduced as recently as January 19. Based on favorable customer reaction to the product, the company is optimistic about the products' prospects.

## Outlook

Rhode commented. "***Our fiscal third quarter showed encouraging results***, particularly with regard to overall sales growth and how quickly our Life Choice products were introduced and accepted into the market. Although our industry is facing increasing input costs, as well as cycles in the economy, we expect a solid finish for our fiscal year, which ends in May. ***We look forward to reporting on our progress.***"

24

44.     On July 1, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "ConAgra Foods Reports Solid Fourth Quarter Sales and Earnings; Expects Solid Fiscal 2005 EPS; Seven Million Shares Repurchased During the Quarter."  The press release stated in part:

> ConAgra Foods, Inc., one of America's leading packaged food companies, today reported earnings for the fourth quarter ended May 30, 2004.  Net income for the quarter rose 41% to $212 million, or $0.40 per diluted share, compared with earnings a year ago of $150 million, or $0.28 per diluted share.  For all of fiscal year 2004, net income rose to $880 million, or $1.66 per diluted share.  In fiscal 2003, the company earned $775 million, or $1.46 per diluted share.

> ***Bruce Rohde, chairman and chief executive officer, commented, "Fiscal year 2004 was a year of significant momentum for ConAgra Foods; we accomplished the strategic reshaping of our portfolio that we set out to do by completing the divesture of non-core businesses, and we made measurable progress with key initiatives designed to drive profitable future growth.  We are expanding profit margins through sales, marketing, and operational platform initiatives, as we build our business base into a richer, and more consumer-focused enterprise.***

> **For the quarter**: Sales were up 9% to $4.0 billion vs. $3.6 billion last year.  Current quarter operating profit was $465 million, 4% below the $486 million reported last year.  On a comparable basis, sales were 4% ahead of last year and operating profit increased 2% over last year, after considering the impact of prior year contributions from businesses the company no longer owns, fiscal year 2004 costs associated with implementing efficiency initiatives, the estimated benefit from the inclusion of one additional week in the fourth quarter, and changing the fiscal year-end for an operation within the Food Ingredients segment to match ConAgra Foods fiscal year-end, all of which are detailed in tables at the end of this release.  Current quarter income from continuing operations before income tax and the cumulative effect of changes in accounting was $305 million, equal to last fiscal year.

> **For fiscal 2004**: Sales were $14.5 billion, 14% below last year's sales of $16.9 billion.  Fiscal year 2004 operating profit totaled $1.7 billion, 8% below $1.9 billion reported last year.  Sales increased 3% and operating profit increased 2% on a comparable basis, after considering the impact of prior year contributions from businesses the company no longer owns, fiscal year 2004 costs associated with implementing efficiency initiatives, and the estimated benefit from the inclusion of an additional week in the full fiscal year 2004, all of which are detailed in tables at

25

the end of this release. For the fiscal year 2004, income from continuing operations before income tax and cumulative effect of changes in accounting was $1.2 billion, down 6% compared to last year.

**Segment Comments & Operating Efficiency Initiatives**

Reflecting strategic portfolio changes and management realignment in 2004, the company began reporting its operations in three segments: Retail Products, Foodservice Products, and Food Ingredients. Historical segment results have been adjusted to reflect the segment changes.

The company has several operating efficiency initiatives underway that are designed to improve the company's cost structure, margins, and competitive position. Implementing these initiatives resulted in approximately $62 million of charges, or $0.07 per diluted share of expense for the fiscal year 2004; this includes $24 million, or $0.03 per diluted share, in the fourth quarter. Most of the expenses were incurred in the Foodservice Products and Retail Products segments. The company currently plans for these initiatives to continue in fiscal year 2005 and result in approximately $0.03 per diluted share of similar charges that year.

**Retail Products**

Sales for the Retail Products segment (58% of total annual sales) were $2.2 billion for the fourth quarter, up 3%. Sales were essentially equal to last year on a comparable basis, after considering the impact of prior year contribution from businesses the company no longer owns and the estimated benefit from the inclusion of one additional week in the fourth quarter, which are detailed in tables at the end of this release.

- Several major consumer brands posted sales gains on a comparable 13-week basis including: Banquet, Blue Bonnet, Chef Boyardee, DAVID, Egg Beaters, Hebrew National, Hunt's, Kid Cuisine, La Choy, Manwich, Marie Callender's, PAM, Peter Pan, Reddi-wip, Slim Jim, Snack Pack, Wesson, and others. Many have posted several successive quarters of solid sales growth and strong category performance.

The sales performance reflects distribution gains for many products. Efforts to expand distribution have been made more effective by the unification of the retail sales team; earlier in fiscal 2004, the retail sales force consolidated and now serves customers as a consolidated ConAgra Foods team representing the ConAgra Foods Retail Products portfolio. This consolidation is expected to improve customer contact, service, and expand product promotion and bundling opportunities that benefit customers and the company.

26

Improved marketing efforts for some brands are starting to favorably influence brand performance, as the company has formalized its approach to building brands to utilize best practices and to prioritize marketing investments. In addition, selling prices for many items are increasing, made necessary by rising input costs. Other factors contributing to the improved sales performance include a portfolio that has a variety of quality foods and product platforms which are on-trend with current consumer preferences. Life Choice, the company's new line of frozen meals targeting carb-conscious consumers, performed well. During the quarter, the company introduced Banquet® Crock-Pot® Classics, a new line of frozen meals specifically for Crock-Pot® slow cookers; the product is off to a strong start and the company is optimistic about its prospects. Weak popcorn volumes negatively impacted the segment's sales performance, due to category and competitive challenges.

The Retail Products segment operating profit for the quarter was $315 million, 7% below the $340 million posted last year. On a comparable basis, operating profit was 11% below last year after considering the impact of prior year contribution from businesses the company no longer owns, fiscal year 2004 costs associated with implementing efficiency initiatives, and the estimated benefit from the inclusion of one additional week in the fourth quarter, as detailed in tables at the end of this release. Increased input costs, which were not fully offset by higher selling prices during the year for several of the company's products, negatively affected segment profits as did a less favorable mix of products. The company noted that operating profits for its branded processed meats and popcorn products were weak compared to past trends, reflecting current category and competitive challenges.

Fiscal year 2004 sales for the Retail Products segment reached $8.4 billion, 3% below the $8.7 billion reported last fiscal year primarily due to divestitures. Operating profit for the segment was $1.2 billion, 7% below the $1.3 billion reported last fiscal year. Sales were 1% ahead of last year and operating profit was 4% below last year after considering the impact of the prior year contribution from businesses the company no longer owns, fiscal year 2004 costs associated with implementing efficiency initiatives, and the estimated benefit from the inclusion of one additional week in the full fiscal year 2004, all of which are detailed in tables at the end of this release.

\*   \*   \*

**Outlook**

**The Company believes fiscal 2005 will show a solid EPS performance and growth in sales and operating profits from its current business segments. In addition to paying a strong dividend, the company expects to continue allocating**

*capital toward repurchasing its shares during fiscal 2005 as well as toward acquisition opportunities that fit with the company's strategic and financial goals.*

45.    On September 22, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "ConAgra Foods Reports Strong First Quarter Sales with Solid Profits; Share Repurchases Continued During the Quarter."  The press release stated in part:

> ConAgra Foods Inc., one of North America's leading packaged food companies, today reported earnings for the first quarter ended Aug. 29, 2004.  Net income for the quarter was $135 million, or $0.26 per diluted share, and includes $0.02 per share of previously announced costs related to implementing efficiency initiatives.  Earnings for the first quarter last year were $195 million, or $0.37 per diluted share, reflecting contribution from businesses the company no longer owns, as well as other items that impact year-over-year comparability.
>
> Sales for the company increased 8% to $3.5 billion from $3.2 billion last year. Current quarter operating profit was $341 million, 9% above the $312 million reported last year.  Current quarter income from continuing operations before income tax and the cumulative effect of changes in accounting was $214 million, 29% ahead of $166 million last fiscal year.
>
> *Bruce Rohde, chairman and chief executive officer, commented, "Our first quarter sales were very strong, reflecting excellent volumes for many of our brands.  Our sales and marketing initiatives are gaining significant momentum, and we are pleased with the progress."*
>
> *Rohde continued.  "And because we have taken some price increases and reduced operating expenses in several areas, our overall operating profit this quarter was solid, but it was not as strong as we wanted; this was mainly due to significantly increased input costs across the industry.  As we plan for the balance of this fiscal year, we expect to continue making price adjustments to offset increased input costs, as well as to continue growing volumes and capitalizing on cost savings opportunities so that we strengthen margins throughout the year."*
>
> **Retail Products (68% of total sales)**
>
> Sales for the Retail Products segment increased 9% to $2 billion, the result of 8% volume growth.
>
> - Brands posting sales gains include: ACT II, Armour, Banquet, Blue Bonnet, Butterball, Chef Boyardee, Cook's, DAVID, Eckrich, Egg Beaters, Hebrew National, Hunt's, Kid Cuisine, Manwich, Marie Callender's, PAM, Parkay,

28

Peter Pan, Reddi-wip, Swiss Miss, and Wesson; many of these increased at double-digit rates.

- Sales for the company's top 30 brands as a group, which represent almost 80% of total segment sales, grew 9%; category share trends for many of the company's most significant brands showed solid year-over-year improvement.

The strong volume performance reflects disciplined sales and marketing initiatives designed to continually strengthen brand equities, increase category shares, expand distribution, optimize return on marketing investment, and improve profit contribution from new items. The company notes that segment volume performance in the first quarter last fiscal year was soft, reflecting the consolidation of the Retail Products sales force underway at that time. This consolidation, now complete, reduced the role of brokers and resulted in a direct approach for serving customers. That transition has resulted in improved sales execution, which contributed to the strong volume performance this quarter. During the quarter, the segment's selling prices increased slightly, which only partly offset higher input costs; additional price increases continue to be implemented to address increased raw material costs.

The Retail Products segment operating profit for the quarter was $213 million, 3% above the $208 million posted last year, reflecting the strong volume performance and a focus on operating cost reduction in the face of increased input costs. Significantly increased input costs negatively impacted operating profit growth and profit margin, as did $8 million of costs associated with implementing efficiency initiatives. Profits for branded processed meats were significantly below prior year results, reflecting a combination of increased costs and competitive challenges. The company expects price increases as well as the marketing and operating initiatives underway to accelerate the rate of operating profit growth for this segment as the fiscal year progresses.

\* \* \*

**Outlook**

***The company believes that the marketing and operating initiatives currently being implemented, along with appropriate price increases, and the share repurchase program, will drive a solid EPS performance this fiscal year; the company expects the benefit of its profit-enhancing initiatives and pricing actions to be more apparent in the company's profit margins (profit as a percentage of sales) during the second half of the fiscal year than in the first half.***

46.     On September 22, 2004, the Company hosted a conference call for analysts, investors and media representatives, during which defendant Rohde stated the following:

[ROHDE]: We're also working on better linking our information platforms and that's a project that we call "Nucleus." It's purpose is to tightly link manufacturing, marketing, and sales, as well as all the other key areas of our business to attack service and cost improvement opportunities with better decision support tools.

In a nutshell, I'd say that we're progressively seeking a new level of excellence for our company and a strong earnings potential to go with it. With all that in mind, I'll say that I'm optimistic that fiscal '05 will progress and will be a solid performer.

I look for the overall profit margins to improve as the fiscal year moves forward. Some of that should come from the benefits we expect from the initiatives I've just mentioned, particularly the cost savings initiatives that we're aggressively implementing as we speak, but also our outlook shaped by the fact that we plan to keep adjusting our prices upward to offset the increased input costs that we've all been experiencing.

We're not out of the woods on that yet, but another 90 days or so should make a marked difference as prices catch up with costs. Net-net, all those things should contribute to a more solid spring selling season.

47.     On September 28, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "ConAgra Foods Receives $194 Million for Equity Interest, Expects to Receive $300 Million for Certain Assets." The press release stated in part:

ConAgra Foods Inc., one of North America's leading packaged food companies, today announced that Hicks, Muse, Tate & Furst, Incorporated has exercised its option to acquire ConAgra Foods' minority interest in Swift Foods; Swift Foods is the company created when ConAgra Foods divested its fresh beef and pork operations approximately two years ago. For its minority interest, ConAgra Foods received $194 million, and will record no gain or loss on the transaction.

48.     On December 22, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "ConAgra Foods Repots Strong Second-Quarter Sales. All Segments Post Operating Profit Growth." The press release stated in part:

ConAgra Foods Inc., one of North America's leading packaged food companies, today reported results for the fiscal 2005 second quarter, which ended Nov. 28, 2004. Sales for the quarter increased 8% to $4.1 billion. Diluted EPS from continuing operations was $0.47 for the quarter, compared with $0.45 last year. Current quarter operating profit was $545 million, 10% above last year, as all segments posted operating profit growth in the current quarter. Current quarter income from continuing operations before income tax was $390 million, 6% above last year.

Bruce Rohde, chairman and chief executive officer, commented, "The company is tracking with its plan for solid EPS performance this fiscal year. Our sales growth this quarter builds on last quarter's strong to-line performance and reflects continued progress with marketing and operating initiatives being implemented to fuel profitable growth. As expected, we continued to experience increased input costs in several areas of our business, which we were able to largely offset through volume gains, price adjustments, better sales and marketing, and cost-saving initiatives. We look forward to this momentum continuing through May, which concludes the second half of our fiscal year."

For the first six months of fiscal 2005, total sales increased 8% to $7.6 billion. Operating profit was $886 million, 9% above last year. Income from continuing operations before income tax and cumulative effect of change in accounting was $605 million,13% above last year. Diluted EPS for the first half of fiscal 2005 was $0.73, compared with $0.87 last year; several items impact the year-over-year EPS comparison. Those items are detailed later in this release and in the supplemental question-and-answer document relating to this release posted on the company's Web site at www.ConAgrafoods.com under the section for Investors.

**Retail Products (60% of total sales)**

For the quarter, sales for the Retail Products segment increased 9% to $2.5 billion, reflecting healthy volume growth of approximately 7% as well as increased pricing necessitated by higher input costs.

- Brands posting sales gains include: ACT II, Armour, Banquet, Blue Bonnet, Chef Boyardee, Cook's, DAVID, Echrich, Egg Beaters, Hunt's, Kid Cuisine, La Choy, Marie Callender's, Orville Redenbacher's, PAM, Parkay, Peter Pan, Reddi-wip, Snack Pack, Swiss Miss, Van Camp's, and Wesson; more than half of these brands posted double-digit sales increases. The company notes that major brands including Banquet, Chef Boyardee, Egg Beaters, Marie Callender's, and PAM have posted double-digit sales growth for several successive quarters.

- Sales for the company's top 30 brands as a group, which represent almost 80% of total segment sales, grew 8%; many of the company's most significant brands posted year-over-year gains in category shares, reflecting improved execution of sales and marketing programs. The quarter's top-line performance reflects strong sales trends across a wide range of retail customer channels, including grocery stores, dollar stores, club stores, and mass merchandisers.

The strong top-line performance reflects the implementation of initiatives designed to continually strengthen brand equities, expand distribution for the company's most promising products, and improve returns on marketing investments. Price increases accounted for approximately 2% year-over-year sales growth. All operations within the Retail Products segment – deli, frozen, grocery, refrigerated, snacks, and international – showed sales growth. The company notes particular success with Banquet® Crock-Pot® Classics™, which is the first complete line of meals designed and created for slow cooking. After being introduced only last spring, the product now has national distribution, and is expected to generate revenue approaching $100 million for ConAgra Foods in the first year of production.

The Retail Products segment operating profit for the quarter was $375 million, 5% above the $358 million posted last year. This growth reflects strong volume performance, as well as price adjustments and cost-saving initiatives which together largely offset increased input costs. Segment operating profit grew at a slower rate than sales, reflecting increased input costs and a less favorable mix of products sold. Lower selling, general, and administrative expenses resulting from more efficient marketing investments and better expense management contributed to the operating profit growth. Profits for popcorn products and branded processed meats were below prior-year results, largely due to category and competitive pricing challenges.

Year-to-date sales for the Retail Products segment were $4.5 billion, up 9% over last year on volume growth of 8%. Operating profit was $589 million, 4% above the $566 million posted last year; year-to-date results include $12 million of costs related to implementing efficiency initiatives and prior-year amounts include $7 million of such costs.

The company continues to streamline its purchasing, manufacturing, logistics, and administrative functions to make operations more efficient and expects operational improvements to result in year-over-year profitability gains for this segment in the second half of the year.

**Foodservice Products (23% of total sales)**

Sales for the Foodservice Products segment were $940 million for the second-quarter, 2% below last year, reflecting decreased seafood product sales and the fact that prior-year amounts included $10 million of sales from businesses the company no longer owns. Sales for specialty potato products were strong, while seafood products sales declined due to tariff-related market dynamics. Segment operating profit for the quarter was $91 million, 6% above the $86 million posted last year, reflecting reduced operating expenses and, to a lesser extent, solid sales performance with specialty potato products. For the segment as a whole, improved mix and pricing actions offset rising input costs during the quarter. Operating profits from seafood products and culinary products were lower than comparable amounts a year ago. Operating profits for seafood products declined due to tariff-related market dynamics, and operating profits for culinary products declined mostly due to competitive challenges with prepared meat offerings. To a lesser extent, culinary products operating profits were also negatively impacted by unfavorable production costs resulting from a planned plant consolidation. ***The company expects this segment to post profitability gains in the second half of the year, due to operational improvements and the fact that prior-year results included costs associated with implementing efficiency initiatives***.

Year-to-date sales for the Foodservice Products segment were $1.8 billion, essentially equal to last year. Segment operating profit was $158 million, $4 million below the $162 million posted last year, reflecting approximately $17 million of unfavorable production costs associated with a planned plant consolidation. In addition, current year-to-date results include $4 million of costs related to implementing efficiency initiatives; prior-year amounts do not include any such costs.

*   *   *

**Earnings from Equity Method Investments**

Equity method investment earnings from various investments for the quarter were $15 million, compared with $15 million for the same quarter last year. Equity method investment earnings for the first half of fiscal 2005 were $29 million, compared with $28 million for the same period last year.

**Corporate Expense**

Corporate expense was $85 million for the quarter, compared with $79 million last year. For the first half of the fiscal year, corporate expense was $152 million, compared with $171 million last year; the year-over-year decline reflects approximately $25 million in the prior year for a litigation settlement.

**Capital Resource Management**

- During the quarter, ConAgra Foods sold its minority interest in Swift Foods to Hicks, Muse, Tate & Furst for $194 million, resulting in no significant gain or loss. ConAgra Foods no longer holds any equity position in fresh beef and pork processing.

- ConAgra Foods is in the process of recovering the financing it provided in connection with Swift Foods' cattle-feeding operations. The financing, which ConAgra Foods provided for two years, included a line of credit and a note receivable totaling approximately $300 million at maturity. During the quarter, the financing matured and ConAgra Foods assumed control of the cattle-feeding assets in order to liquidate them in an orderly manner. The feedlots have been sold, and the sale of the retained live cattle is in process and should be completed early in calendar 2005. The company has received $146 million from the liquidation as of the end of the second-quarter, and, in due course, expects to fully recover all of the cattle-feeding-related financing provided to Swift Foods.

- On Dec. 13, ConAgra Foods sold 10 million shares of Pilgrim's Pride Corporation (NYSE: PPC) common stock for more than $280 million, and the resulting pretax gain of approximately $185 million will be recorded in the third quarter of fiscal 2005. ConAgra Foods received these shares in the fall of 2003 in connection with the divestiture of its chicken processing operations to Pilgrim's Pride. ConAgra Foods still owns 15.4 million shares of Pilgrim's Pride common stock that are subject to resale restrictions; ConAgra Foods plans to sell these shares at the appropriate time in accordance with these restrictions.

- The company is committed to capital allocation in a way that appropriately utilizes excess cash:

  - The company has been using cash to opportunistically repurchase its common stock. The company has repurchased approximately $600 million of its stock over the past year.

  - The company has also been using cash to retire debt that has become due or that will soon be due:

    - During the quarter, the company retired $300 million of $7.4% subordinated debt that was due September 2004.

34

- Subsequent to quarter-end, the company retired $600 million of 7.5% senior debt due September 2005.

- For the quarter, capital expenditures for property, plant, and equipment totaled $150 million compared with $82 million last year; the increase over last year is due principally to additional investment to update strategic information systems for the future. Depreciation and amortization expense was approximately $85 million for the quarter versus $86 million a year ago. Dividends paid totaled $134 million versus $131 million last year. Net interest expense for the quarter was $86 million compared with $68 million last year; current-year amounts include $14 million of additional interest expense associated with a previously terminated interest rate swap.

- For the first half of the fiscal year, capital expenditures for property, plant, and equipment totaled $255 million compared with $152 million last year; the increase over last year is due principally to additional investment to update strategic information systems for the future. Depreciation and amortization expense was approximately $174 million for the first six months versus $171 million a year ago. Dividends paid totaled $269 million for the fiscal-year-to-date versus $262 million last year. Net interest expense for the fiscal-year-to-date was $159 million compared with $134 million last year; the year-over-year increase is driven primarily by the impact of interest rate swaps.

**Outlook**

*The company expects the second half of fiscal 2005 to show year-over-year profit growth, largely due to ongoing operational improvements.*

Bruce Rohde commented, "Our team is focused on marketing, operating, and information systems initiatives that will help expand profit margins over the long term. These activities will help us grow our to-line while operating an increasingly efficient supply chain that reflects low-cost manufacturing, purchasing, and logistics operations. Our supply chain efficiency should be further enhanced by an ongoing program that drives an increased focus on our highest-margin, highest-opportunity items, and which phases out low-margin items. This program should enhance our sales and profit performance as we increase our focus on our most promising and profitable products. The potential for these activities to favorably impact profit margins over the long term makes this a great time to be a part of the ConAgra Foods team, and I look forward to updating you on our progress."

35

49.    Subsequently, on December 22, 2004, the Company hosted a conference call for

analysts, investors and media representatives, during which defendant Rohde stated the following:

[ROHDE]: I'll start by saying that there are a lot of reasons to be pleased with our second quarter.  We're reaping the benefits of the strategic shift we made in our sales mix and that shift is steadily improving our profits.

Overall, sales were up at a healthy rate in the second quarter, and all segments posted operating profit growth.  That makes for a solid first half of the fiscal year in terms of EPS from continuing operations, and with our top line again showing momentum this quarter, we expect this trend to contribute to a successful second half.

Our solid first half is the result of a dedicated team effort which is focused on three strategic initiatives that you've heard us discuss before.  Those are the marketing, operating, and information systems initiatives that we have underway.

*    *    *

The operating efficiency initiatives across our supply chain go hand in hand with our new information systems because we'll now be able to focus on our most promising and profitable products while we systematically identify and phase out those that are less profitable.

This amounts to disciplined SKU prioritization, which simply means we'll be increasing our focus on our highest margin, highest moving, highest opportunity items, and we'll be aggressively phasing out our lower margin, lower moving items through a planned substitution process.  It's all part of a strategic plan for continuous mix improvements to generate more gross profit per dollar of sales.

This process is actually going to help our top line growth as we simplify and focus our sales and marketing efforts so that we can better utilize our manufacturing resources on the products that have the highest growth potential and which can most likely improve our total gross margin dollars.  There's a lot of opportunity to become more efficient here and that translates into significant opportunity for margin expansion.

So, I'll conclude my remarks today by saying that we think fiscal 2005 has been a year of progress so far and we think the second half, which stretches from now until Memorial Day weekend, shows a lot of promise for another fiscal year of solid performance because of the traction we're gaining with the three strategic initiatives we have underway.

36

50.    On February 22, 2005, the *Associated Press* published an article entitled "ConAgra

Expects Weaker Third Quarter Due to Weak Results in Branded Meats."  The article stated in part:

> Packaged foods giant ConAgra Foods Inc. Said Tuesday its third quarter profits will
> include a $50 million after-tax charge because of food production problems,
> temporary inefficiencies in technology consolidation and weak results in refrigerated
> branded meats.
>
> Earnings will be reduced about 10 cents per share, the company said.
> Company officials declined to estimate results beyond that statement.
>
> Analysts surveyed by Thomson First Call had expected earnings of about 42
> cents per share in the quarter, which ends Sunday and will be reported March 24.
>
> ConAgra shares fell $1.03, or 3.6 percent, to close at $27.50 in Tuesday
> trading on the New York Stock Exchange.  Shares have traded between $25.38 and
> $30.24 over the past 52 weeks.
>
> About half of the 10 cents a share impact is due to weak performance in
> banded processed meats and half is due to production and information consolidation
> problems, ConAgra officials said.
>
> Prices have not kept pace with rising costs in the refrigerated meats segment,
> including hot dogs and deli meats sold under Armour, Hebrew National, Eckrich and
> Butterball brands, company spokesman Chris Kircher said.
>
> Strong consumer demand combined with manufacturing consolidation and
> installation of new equipment has cut into production and the ability to fill orders, the
> company said.
>
> ***In addition, ConAgra Foods is having some difficulty consolidating order
> processing, logistics, invoicing and cash collection.***
>
> Company officials also said costs including operational changes, legal and tax
> matters will cut into its previously announced pretax gain of $185 million from its
> December sale of 10 million shares of stock in Pilgrim's Pride Corp.  ConAgra
> gained the stock when it sold its chicken processing division to Pilgrim's Pride.

37

51.    While this article indicated some problems at ConAgra, shareholders were unaware and uninformed that its FY:02-FY:05 financial results were actually false, or that ConAgra's business was not performing nearly as well as represented.

## THE TRUTH BEGINS TO EMERGE

52.    On March 24, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "ConAgra Foods Reports Preliminary Third-Quarter Results."  The press release stated in part:

- Preliminary third-quarter fiscal 2005 diluted EPS is $0.31.

- The $0.31 includes $0.03 of net expense from items affecting comparability as detailed toward the end of this release.

- Third-quarter fiscal 2005 sales were $3.6 billion, slightly ahead of last year.

- Operating profit posed a year-over-year decline, largely reflecting increased input costs and challenges in the packaged meat operations.  Manufacturing network changes, and to a lesser extent business process changes connected with *Project Nucleus*, resulted in transitional disruption which also negatively impacted quarterly profits; those changes are part of long-term profit-enhancing initiatives.

- ***During the quarter, the company discovered errors in previously reported amounts related to income tax matters.  None of the errors relate to the operating performance of the company's segments.  As soon as possible, the company will restate historical results to correct the errors; on a preliminary basis, the errors are estimated to reduce after tax profits principally in fiscal 2003 and fiscal 2004 in the range of $150 million to $200 million in aggregate, and there will be corresponding cash payments in connection with those errors.  The company plans to provide revised comparative financial information at the time of its 10-Q filing.  Because the company is still in the process of determining the amount of the errors, it considers the results in this release preliminary.***

ConAgra Foods, Inc., one of North America's leading packaged food companies, today reported results for the fiscal 2005 third quarter, ended Feb. 27, 2005.  Sales for the quarter were $3.6 billion, up 1%.  Current quarter income from continuing

38

operations before income tax was $314 million, equal to last year.  Preliminary diluted EPS was $0.31 for the quarter.

Bruce Rohde, ConAgra Foods chairman and chief executive officer, commented, "Our company dealt with several changes and challenges during the quarter that negatively impacted performance.  Two of these challenges manufacturing network changes and the organization's transition to new business processes as part of *Project Nucleus* – are short-term in nature.  These challenges occurred while implementing significant improvements and are part of our long-term profit-enhancing initiatives.  Our most significant challenge – increased input costs in our retail packaged mats business – has impacted us for several consecutive quarters, and we are taking specific actions to address the problems.  These actions include implementing more effective price increases and SKU rationalization efforts."

Rohde continued, "The short-term challenges connected to manufacturing and the organization's transition to *Project Nucleus* are mostly resolved, and are not expected to impact the fourth quarter as they did in the third quarter.  While we consider the short-term challenges to be a natural outcome of implementing significant changes, we still need to improve our overall execution and more effectively anticipate and deal with our operational issues.  The momentum we built in the last half of fiscal 2004 and the first half of fiscal 2005 was interrupted this quarter, but we expect to get back on track over the next few quarters as we work through the current challenges and as we continue to focus on our fundamentals to improve margins and returns over time.  This includes generating consumer preference for our products operating more efficiently, strengthening customer service, and prudent capital deployment"

*Project Nucleus* is the company's information-based business process initiative that is systematically linking sales, marketing, logistics, manufacturing functions, and customer interfaces across ConAgra Foods.

53.     On March 24, 2005, the Company hosted a conference call for analysts, investors and

media representatives, during which defendant Rohde stated the following:

[ROHDE]: My last comment is about leadership and a culture that does the right things.  Frank just addressed historical errors related to accounting for income taxes.  It is important to underscore that he and his team uncovered those problems, surfaced them and are correcting them with all due speed.

While I don't like the news any better than you do, I'm proud of these people.  It is unpleasant business to deal with errors, or in the case or this quarter, to come out

39

early to investors and detail operational challenges. But in each case it was the right thing to do and in each case it makes the Company stronger in the long run.

At the same time, as we deal with the day-to-day challenges of running this business, we still need to keep our eyes on the ball for all of the major initiatives we have underway to better serve our customers, to operate more efficiently and to deliver brands and quality products that consumers prefer. As you heard from Dennis, Allan, Greg and Frank, all eyes are very much on the ball.

There are brands that are growing. These are businesses that are improving their operations. Capital is being repositioned. Debt being paid down. Operating improvements are the order of the day.

This team is focused on regaining the momentum that it has been building. We made a lot of progress in transforming the structure of this Company, se we're not about to let up now as we're in the midst of transforming and integrating the various core activities that support the transformation. And over time, we look for progress as a result of these efforts to be readily apparent and positive, spurring not only efficiency, but growth.

54. On March 24, 2005, *Dow Jones Newswire* reported "ConAgra to Restate Results; Costs Hurt Q3." The article stated in part:

ConAgra Foods, Inc. Said Thursday it will restate results for the last two fiscal years after discovering income tax errors as the packaged-food company's third-quarter earnings came up short due partly to higher raw-material costs.

In a statement, "CEO Bruce Rohde vowed Omaha, Neb. Company will take "specific actions" to address the higher materials costs, including "more effective price increases."

ConAgra, which makes such food brands as Wesson, Chef Boyardee, Slim Jim and others, the results for fiscal 2003 and 2004 will be restated to reflect an estimated reduction in after tax profits of $150 million to $200 million in total.

The company discovered the errors during its review of financial controls under new regulatory requirements. Cash payments will be made to rectify the mistakes.

Because the size of the errors is still being determined, ConAgra reported third-quarter results on a preliminary basis. For the three months ended Feb. 27, the company said net income was $160.2 million, or 31 cents a share.

\* \* \*

A series of charges and gains resulted in quarterly net expense of three cents a share in the latest quarter, the company said. Analysts polled the Thomson First Call had been looking for earnings, on average of 32 cents a share.

55.     On March 24, 2005, Prudential Equity Group wrote:

CAG is not admitting errors in tax payments in fiscal 2004 and 2003 that may total between $150 million and $200 million. That works out to nearly $0.20 per share annually or between 10% and 15% of earnings. CAG is in the process of restating earnings for both years and we ask why not restate the bonus for the CEO given these circumstances?

\* \* \*

For a company as big as CAG, $200 million cash is not the end of the world. The bigger issue is obviously operations and not accounting and we will get to those matters shortly. But we indicated in our CAGNY write-up and reiterate now, a CEO has to stand up, answer questions and be accountable for actions of his company. By not answering questions on this massive tax accounting error, Mr. Rohde is again not fulfilling a major need of a CEO, in our opinion. The CFO (Frank Sklarsky) called us and explained how the VP taxes left in late November and how past structure separated the controller and the tax department functions.

56.     The same day, Deutsche Bank-North America wrote that:

ConAgra offered up another surprise to investors by indicating that improper tax accounting will hurt, on a preliminary basis, F2003 and F2004 to the tune of $150-200 million in aggregate or roughly 11% of past reported earnings over the two year period. Management noted that efforts were being made to lower the ongoing corporate tax rate (currently 38-39%) as it is well above the peer group, when it was discovered that past accounting errors required review and a restatement. The issues involve booking a capital loss carry forwards and foreign tax credits, most of which we believe are tied to the former beef and pork processing assets that have since been sole. Inexplicably *the tax group formerly did not report to the former CFO, an obvious control issue and something, in our view, the Board should reprimand CEO Rohde for allowing*. We would remind the Board this follows on accounting problems at UAP several years ago, and thus one would have thought a full review would have been implemented at that time!

41

57.     On this news of deficient controls and accounting problems, among other things, the Company's shares plummeted to the $26 per share range from the $27-$28 range prior to the announcement.  Concealment of these problems allowed defendant Rohde to reap millions in ill-gotten bonuses, and once disclosed, erased over $3 billion in market capitalization.  Misstatements that the projected Q4:05 results would exceed the third quarter results minimized the impact of the negative news and ConAgra's stock continued to be artificially inflated.

58.     On April 8, 2005, *Bloomberg* published an article entitled "ConAgra Delays Quarter Filing to Review Tax Errors."  The article stated in part:

> ConAgra Foods, Inc., the third-largest U.S. food company, delayed the filing of its quarterly earnings report to allow for more time to review accounting errors the company disclosed last month.
>
> Because the "company is still in the process of determining the effect of the errors on the three-month and nine-month periods ended Feb. 22, 2004, it has not finalized the correction of the errors for those periods at this time."  Omaha, Nebraska-based ConAgra said today in a statement with the U.S. Securities and Exchange Commission.
>
> The delay affects the earnings report for the quarter ended Feb. 27, which was due to be filed today, the company said.
>
> ConAgra said March 24 it found errors in accounting for tax expenses that will reduce net income by a total of $150 million to $200 million in fiscal 2003 and 2004.  That's as much as 12 percent of the $1.65 billion of net income ConAgra reported for the two-year period.
>
> ***A new president for tax matters and more accounting staff were to be hired to fix "a material weakness in internal controls," the company said.***

59.     On April 13, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "ConAgra Foods Third Quarter 10-Q."  The press release stated in part:

ConAgra Foods, Inc., one of North America's leading packaged food companies, today filed its third-quarter 10-Q, and in it restated historical results to correct errors in previously reported amounts relating to income tax matters.

The quarterly filing shows diluted earnings per share (EPS) for the quarter ended Feb. 27, 2005, of $0.32. The company previously announced preliminary third-quarter diluted earnings per share of $0.31. The change reflects the impact of final adjustments to the company's tax expense for the third quarter.

In its news release of March 24, the company estimated the increased income tax expense to be in the range of $150 million – $200 million in aggregate, principally in fiscal 2003-2004. However, the 10-Q filed today quantifies the net increased expense related to tax matters from *fiscal 2002 through the first half of fiscal 2005* at approximately $105 million. The most significant errors that led to the restatement were in the areas of capital loss carry-forwards and foreign tax credits. *Details including adjustments related to periods prior to fiscal 2002 are contained in the third-quarter 10-Q filed with the Securities and Exchange Commission today.*

The company expects to file restated 10-Qs for the first and second quarters of fiscal 2005 as soon as possible – those 10-Qs will provide comparable prior-year information. The company also expects to file a restated fiscal 2004 10-K as soon as possible, which will contain quarterly EPS amounts for fiscal 2004 as well as fiscal 2003.

60.    On June 7, 2005, the Individual Defendants caused or allowed the Company to issue

a press release entitled "ConAgra Foods Comments on Fiscal 2005 Fourth Quarter and Cost-Savings

Initiatives." The press release stated in part:

Today ConAgra Foods commented on earnings for the fiscal 2005 fourth quarter, which ended May 29, 2005, as well as recent developments in its cost-savings initiatives.

**Fourth Quarter**

Earnings for the company's fiscal 2005 fourth quarter will be lower than expected primarily due to continued weak profitability in the packaged meats operations. Those operations continue to be negatively impacted by high protein input costs coupled with inadequate pricing management.

43

- In its preliminary third quarter earnings release on March 24, 2005, the company indicated that it expected fourth-quarter EPS to modestly exceed third-quarter EPS, excluding items that impact comparability.

- Third-quarter diluted EPS of $0.32 included net $0.02 per share of expense from items that impact comparability.

- Because the expected improvement in the packaged meats business did not materialize, contribution from the packaged meats operation sin the fourth quarter will be in the range of $0.10 per share lower than the company expected when it made previous comments regarding the fourth quarter. The company is not providing a specific fourth-quarter performance number at this time because the results are not yet final; however, the company suggests third parties with estimates of fourth quarter performance, which exclude items that impact comparability, should lower their estimates by an amount similar to the earnings shortfall in the packaged meats operations. Items that impact comparability will include severance charges associated with cost-savings initiatives as discussed later in this document.

The company previously expected aggressive pricing management to improve packaged meats results in the fourth quarter. The pricing actions that were taken were inadequate and were not executed to expectations. The company has recently made several significant personnel changes in its packaged meats operations and expects those changes, along with better pricing management, aggressive cost-savings initiatives, and SKU rationalization, to improve the packaged meat operations over time.

Bruce Rohde, chairman and chief executive officer, commented, "Our fiscal 2005 showed a solid first-half performance, followed by a weak second-half performance largely due to the challenges in our packaged meats business across retail, foodservice, and deli channels. Weak pricing execution negatively impacted our third quarter and continued in the fourth quarter. Our focus is on improving the packaged meat operations with new leadership team members, appropriate pricing, SKU reductions, and more efficient operations."

He continued, "ConAgra Foods has some great packaged meat brands, such as Butterball, Armour, Echrich, Healthy Choice, Hebrew National, and Brown 'N Serve, and we will take the necessary actions to help these fine brands return to normal profitability."

The company will provide details on its fourth-quarter performance in its regularly scheduled earnings release on June 30, 2005.

44

**Recent Developments in Cost-Savings Initiatives**

As previously communicated, the company is actively pursuing SKU and manufacturing rationalization opportunities over the next several quarters as part of business process improvement and efficiency initiatives.  The company continues to identify ways to be more efficient and improve customer service across its sales, marketing, manufacturing, logistics, R&D, and administrative functions throughout the organization.

As part of these ongoing efficiency initiatives, the company is reducing general and administrative expense as well as salaried headcount.  The company is in the process of eliminating several hundred salaried jobs across the organization; these headcount reductions will be largely complete by the end of the first quarter of fiscal 2006, which ends August 2005.  Once completed, savings from the headcount and general and administrative cost reductions are expected to benefit the company's anticipated cost structure by more than $100 million on an annualized basis.  The company will detail the accrued severance costs recorded in the fourth quarter of fiscal 2005, and any other items that impact comparability, in the June 30, 2005, fourth-quarter earnings release.

Rohde commented, "Our company continues to be very focused on operating efficiencies to improve profit margins and returns on capital.  Headcount reductions is very difficult because of the impact on employees and their families, but unfortunately it is a necessary part of creating efficient operations."  He continued, "These headcount reductions are expected to provide significant future savings and reduce complexity in our business, which is necessary for profitable growth and shareholder value.  We will continue to aggressively identify opportunities to be more efficient, and to take appropriate actions when necessary to achieve the efficiencies."

61.     Also on June 7, 2005, the *Associated Press* published an article entitled "ConAgra

to  Miss Forecast, Cut Jobs."  The article stated in part:

ConAgra Foods Inc. Said Tuesday that its earnings will miss forecasts for the fiscal fourth quarter by as much as 10 cents per share, citing a weak performance at its packaged meats business.  ConAgra also said it is cutting several hundred jobs company-wide as part of a plan to reduce costs by about $100 million a year.

The company's shares fell $1.19, or 4.6 percent, to $24.70 in midday trading on the New York Stock Exchange.

ConAgra, one of the nation's largest providers of prepared foods, said an expected improvement in its packaged meats unit that did not materialize in the quarter, leading earnings at that business to come in about 10 cents below internal expectations. While ConAgra declined to give specific fourth-quarter guidance, it recommended that Wall Street analysts lower their outlooks for adjusted earnings by about 10 cents per share.

The company had predicted in March that results in the fourth quarter ended May 29 would modestly exceed its third-quarter adjusted profit of 34 cents per share.

Analysts surveyed by Thompson Financial currently expect the company post a fourth-quarter profit of 36 cents per share, excluding non-operating items.

ConAgra's packaged meat brands include Butterball, Armour, Echrich, Healthy Choice, Hebrew National and Brown 'N Serve. The company also makes a host of other food brands such as Chef Boyardee soups, Slim Jim beef jerky, Orville Redenbacher's popcorn and Pam cooking spray.

The company said in a statement that the packaged meat business has been hurt by high "protein input costs coupled with inadequate pricing management," adding that pricing actions were not executed as planned. Poor performance carried across retail, foodservice and deli sales.

ConAgra said it has introduced new leadership at the packaged meat business and hopes that this, along with further pricing changes, inventory reductions and improved efficiency, will help these operations.

The company said the job cuts will take place though the first quarter of fiscal 2005, which ends in August, and result in charges from severance payments in that period. ConAgra did not provide a specific number for the layoffs in a news release.

ConAgra plans to report final fourth-quarter results on June 30 and provide further details about its cost-cutting program then.

A subsequent June 7, 2005 *Bloomberg* article noted:

"Clearly, nobody in the near term is going to confuse ConAgra with the notion of credibility," said Matthew Kautler, portfolio manager at Rochester, New York-based Clover Capital Management, which owns 500,000 ConAgra shares as part of a $2.4 billion portfolio.

\* \* \*

46

"For the company to cut fourth-quarter guidance by almost a third and blame it all on a unit that contributes 15 percent of revenues, conditions must be pretty bleak in refrigerated meats," Pablo Zuani, a analyst with J.P. Morgan wrote in an [sic] note to investors after today's release.  He rates the shares "underweight."

62.     On this news, the Company's shares fell $1.57, or 6.1% to $24.32 per share.

## REASONS THE STATEMENTS WERE IMPROPER

63.     The true facts, which were known or should have been known by the Individual Defendants but concealed from ConAgra's shareholders during the Relevant Period, were as follows:

(a)     the Company lacked requisite internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts;

(b)     contrary to defendants' claims of fourth quarter 2005 and/or fiscal year 2005 profitability, the Company was actually on track to report losses;

(c)     the Company lacked the necessary personnel to issue accurate financial reports and projections;

(d)     The Company's information technology systems were materially compromised, which **also** materially impacted the Company's ability to issue accurate financial statements and projections;

(e)     the Company initiative to control costs and increase prices was a complete failure as it was unable to push the price increases on its customers in a manner that would not decrease sales such that future results would be much worse than expectations;

(f)     defendants caused or allowed these deficiencies to be concealed for multiple quarters; and

47

(g)     as a result of (a)-(f) above, the Company's projections for FY:05 were grossly inflated.

## IMPROPER FINANCIAL REPORTING
## <u>DURING THE RELEVANT PERIOD</u>

64.     During the Relevant Period, the Individual Defendants caused or allowed the Company to inaccurately report its results for FY:02 through the first half of FY:05 through illegal accounting entries inflating the Company's net income. The Company subsequently has been forced to admit that its net income for FY:02 through the first half of FY:05 were overstated by as much as $105 million.

65.     The FY:02 through first half FY:05 results were included in Forms 10-Q and 10-K filed with the SEC. The results were also included in press releases disseminated to the public. Defendants Rohde, O'Donnell, Batchelder, Bay, Buffett, Chain, Hayes, Jurgensen, Rauenhorst, Reichardt, Roskens and Stinson signed the FY:02 Form 10-K. Defendants Rohde, O'Donnell, Batchelder, Bay, Buffett, Butler, Chain, Hayes, Jurgensen, Krane, Rauenhorst, Reichardt, Roskins and Stinson signed the FY:03 Form 10-K. Defendants Rohde, Batchelder, Bay, Buffett, Butler, Chain, Goldstone, Hayes, Jurgensen, Krane, Rauenhorst, Reichardt, Roskins and Stinson signed the FY:04 Form 10-K. Defendants Rohde and O'Donnell signed the Q1:03, Q2:03, Q3:03, Q1:04, Q2:04, and Q3:04 Form 10-Qs. Defendant Rohde signed the Q1:05 Form 10-Q and the Q2:05 Form 10-Q. Defendants Sklarsky signed the Q2:05 Form 10-Q.

66.     Defendants Rohde and O'Donnell certified the accuracy, as required by §302 of the Sarbanes-Oxley Act of 2002, of ConAgra's Form 10-K filed for the fiscal year ended May 25, 2003. Defendant Rohde certified ConAgra's Form 10-K for the fiscal year ended May 30, 2004.

Defendants Rohde and O'Donnell certified, pursuant to §906 of the Sarbanes-Oxley Act of 2002, ConAgra's Form 10-Qs for Q1;03, Q2:03, Q3:03, Q1:04, Q2:04 and Q3:04.  Defendant Rohde certified the Q1:05 Form 10-Q.  Defendants Rohde and Sklarsky certified the Q2:05 Form 10-Q.

67.     ConAgra has now been forced to admit that it inappropriately recorded transactions included in its FY:02 through first half FY:05 results, and will restate those results to remove some $100-plus million in improperly reported income, such that its FY:02 through first half of FY:05 financial statements were not a fair presentation of ConAgra's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

68.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

69.     In ConAgra's Form 10-K, it was represented that the Company recognized taxes as follows:

> The company accounts for income taxes in accordance with SFAS No. 109, Accounting for Income Taxes.  The company recognizes current tax liabilities and assets based on an estimate of taxes payable or refundable in the current year for each of the jurisdictions in which the company transacts business.  As part of the determination of its current tax liability, management exercises, considerable judgment in evaluating positions taken by the company in its tax returns.  The company has established reserves for probable tax exposures.  These reserves,

included in current tax liabilities, represent the company's estimate of amounts expected to be paid, which the company adjusts over time as more information regarding tax audits becomes available.

70.    In fact, during the Relevant Period, the Individual Defendants caused or allowed ConAgra to improperly recognize income in violation of GAAP, by failing to properly report taxes attributable to the income it reported.  Ultimately, the Individual Defendants caused or allowed the Company to belatedly announce ConAgra would restate its financial statements due to the understatement of taxes.  In a subsequently filed amended Form 10-Q, the Company reported:

> The correction of the errors results in an aggregate net increase in income tax expense of approximately $105 million (including approximately $2 million reflected in results from discontinued operations) for fiscal years 2004, 2003, and 2002 and the first two quarters of fiscal 2005 and an aggregate net decrease in income tax expense of approximately $46 million for years prior to fiscal 2002.  The company estimates additional federal and state cash payments in the range of $70 million to $90 million will be made in the near term in connection with these matters.  The restatement adjustments result in a $48 million reduction of ending stockholders' equity as of November 28, 2004.

*   *   *

- For fiscal 2002, increased income tax expense $11.3 million; decreased net income by $11.3 million; decreased diluted earnings per share of $0.02.

- For fiscal 2003, increased income tax expense $11.0 million; decreased net income by $11.0 million; decreased diluted earnings per share of $0.02.

- For fiscal 2004, decreased selling, general and administrative expenses $1.4 million; increased income tax expense $72.3 million; increased income from discontinued operations $2.4 million; decreased net income by $68.5 million; decreased diluted earnings per share $0.13.

- For the first half of fiscal 2005, decreased selling, general and administrative expenses $10.1 million; increased income tax expense of $9.0 million; decreased income from discontinued operations $4.1 million; decreased net income by $3.0 million; decreased diluted earnings per share $0.01.

50

The company has also changed the presentation of cash flows from discontinued operations to separately present cash flows from discontinued operations for operating, investing and financing activities for all periods presented.

71.     The fact that ConAgra has restated its financial statements for FY:02 to first half FY:05 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material.  Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by ConAgra was to correct for material errors in its previously issued financial statements.  *See* APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs.  *See* APB No. 20, ¶14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements.  ConAgra's restatement was not due to a change in reporting entity or a change in accounting principles, but rather to errors in previously issued financial statements.  Thus, the restatement is an admission by ConAgra that its previously issued financial results and its public statements regarding those results were false.

72.     ConAgra is no stranger to shareholder litigation for issuing false financial statements. In 2001, shareholders filed suit against the Company relating to accounting matters at the former ConAgra subsidiary, UAP, following the Company's June 2001 restatement of earnings in connection with UAP for FY:97-FY:01.  The Company's most recent accounting revelations now inform Plaintiff that the Company's accounting was false every year for the past eight (8) years.

73.     Due to accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles all known, or required to be known, and complied with, by Defendants:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although

52

investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79);

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

74.     The undisclosed adverse information improperly concealed in ConAgra's Relevant Period financial statements is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

75.     As a result of the Individual Defendants' actions, ConAgra's market capitalization has been damaged by over $3.5 billion.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

76.     Plaintiff brings this action derivatively in the right and for the benefit of ConAgra to redress injuries suffered, and to be suffered, by ConAgra as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  ConAgra is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

77.     Plaintiff will adequately and fairly represent the interests of ConAgra in enforcing and prosecuting its rights.

78.     Plaintiff is and was an owner of stock of ConAgra during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

79.     The current Board of Directors of ConAgra consists of the following thirteen individuals: defendants Batchelder, Bay, Buffett, Butler, Chain, Goldstone, Hayes, Jurgensen, Rauenhorst, Reichardt, Rohde, Roskins and Stinson.  Plaintiff has not made any demand on the present Board of Directors of ConAgra to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)     The Human Resources Committee of the Board, by its charter, annually reviews and approves corporate goals and objectives relevant to the CEO's compensation, evaluates the CEO's performance; determines and approves the CEO's compensation levels and reviews and makes recommendations to the Board with respect to the compensation of directors.  The Human Resources Committee is comprised of defendants Reichardt, Batchelder, Chain, Goldstone and

54

Roskens.   As the members of the Human Resources Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Reichardt, Batchelder, Chain, Goldstone and Roskens.  To do so would jeopardize each defendant's personal financial compensation.  Thus, demand on defendants Bay, Buffett, Butler, Hayes, Jurgensen, Rauenhorst, Rohde and Stinson is futile;

(b)     The principal professional occupation of defendant Rohde is his employment with ConAgra, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, for FY:04 and FY:03, ConAgra paid defendant Rohde $7,861,751 and $5,948,938, respectively, in salary, bonus restricted stock awards, LTIP payouts and other compensation.   Accordingly, defendant Rohde lacks independence from defendants Reichardt, Batchelder, Chain, Goldstone and Roskens, defendants who are not disinterested and/or independent and who exert influence over defendant Rohde's compensation members of the Human Resources Committee.  This lack of independence renders defendant Rhode incapable of impartially considering a demand to commence and rigorously prosecute this action;

(c)     Defendant Buffett serves at the request of the Company on the governing boards of a joint venture between South Africa based Tiger Brands and ConAgra for the manufacture and sale of malt products on multiple continents, in which ConAgra has a 50% interest, and a U.S. based venture for environmental research and development, in which has a 50% interest.  As a result of this service, defendant Buffett is compensated $50,000 per annum from each of these ventures for his services.  Defendant Buffett also serves at the request of the Company on the board of an India based venture for the manufacture and sale of food products, in which ConAgra has a 33% interest. Defendant Buffett is compensated $50,000 per annum from the Company for these services.

55

Accordingly, defendant Buffett is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in safeguarding his substantial compensation;

(d)     According to ConAgra's Proxy Statement filed with the SEC on or about August 12, 2004, defendants Butler, Bay, Jurgensen and Stinson were, during the Relevant Period, members of the Audit Committee.  The Audit Committee is responsible, by its charter, for oversight of the integrity of the financial statements of the Company and the compliance by the Company with legal and regulatory requirements.  Specifically, the Audit Committee is charged with reviewing and discussing the annual audited financial statements, including reviewing the specific disclosures made in management's discussion and analysis, with management; determining whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for filing with the SEC; providing oversight of the Company's internal audit function, including reviewing repots on the organizational structure, budget, plans and results of internal audit activities and adequacy of the Company's internal controls; reviewing the appointment and replacement of the senior internal auditing executive, and review significant issues identified by the internal auditing department; and discussing with management the Company's earnings press releases, including the use of any non GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies.  Nonetheless, the Audit Committee recommended that the Board of Directors include the improper audited consolidated financial statement sin ConAgra's Annual Report on Form 10-K for the years ended May 30,2 003 and May 30, 2002, as filed with the SEC, as well as the other improper financials described herein.  By such actions, defendants Butler, Bay, Jurgensen and Stinson breached their duties by causing or allowing

56

the improper financials described above.  As a result of these defendants' breach of their duties, any demand upon them is futile;

(e)     Defendant Butler, by his specialized financial expertise, was in a unique position to understand the business of ConAgra, as well as its finances, markets and present and future business prospects.  Specifically, defendant Butler was chairman and CEO of KPMG LLP (national public accounting firm) from 1996 to 2002.  Defendant Butler has a bachelor's degree in business from the University of Missouri and is a certified public accountant.  This defendant, because of his unique qualifications, had a heightened duty to insure the accuracy and fairness of ConAgra's financials.  Nonetheless, defendant Butler breached his duties by causing or allowing the improper financials described herein.  As a result of this defendant's breach of his duties, any demand upon him is futile;

(f)     Defendants Batchelder, Bay, Buffett, Butler, Chain, Goldstone, Hayes, Jurgensen, Rauenhorst, Reichardt, Roskens and Stinson as non-employee directors of ConAgra are paid $50,000 per year.  Defendants Reichardt, Butler, Buffett, Roskens and Chain as chairmen of the Human Resources, Audit, Corporate Affairs, Nominating and Corporate Governance Committees, respectively, are paid an additional $25,000 per year.  Each of these defendants also receives an annual grant of 1800 ConAgra shares and 9,000 options to purchase ConAgra shares.  Accordingly, defendants Batchelder, Bay, Buffett, Butler, Chain, Goldstone, Hayes, Jurgenson, Rauenhorst, Reichardt, Roskens and Stinson have an interest in safeguarding their substantial compensation and demand that they commence and vigorously prosecute this action is a futile and useless act;

(g)     The entire ConAgra Board of Directors and senior management participated in the wrongs complained of herein.  ConAgra's directors are not disinterested or independent due

to the following: defendants Batchelder, Bay, Buffett, Butler, Chain, Goldstone, Hayes, Jurgensen, Rauenhorst, Reichardt, Rohde, Roskens and Stinson served on the ConAgra Board during the Relevant Period.  Pursuant to their specific duties as Board Members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above referenced defendants breached the fiduciary duties that they owed to ConAgra and its shareholders in that they failed to prevent and correct the improper financials.  Thus, the ConAgra Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected ConAgra to millions of dollars in liability for possible violations of applicable securities laws;

(h)     The Individual Defendants, because of their interrelated business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.  In addition to the conflicts that exist as a result of their participation in the improper accounting and insider selling, as detailed herein supra, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements;

(i)     ***Bay and Stinson Are Long Time Business Associates:***

Defendant Bay is a director of Peter Kiewit Sons, Inc. ("Kiewit") and has been since March 1999.  Defendant Stinson was CEO of Kiewit from March 1998 until December 2004 and was President of Kiewit from August 1997 until December 2000.  Stinson has been a director and Chairman of the Board of Kiewit since August 1997.  Because of their long standing and entangling business and professional relationships, neither defendant Bay nor defendant Stinson will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(ii)     ***Butler and Reichardt Are Long Time Business Associates:***

Defendant Butler is a director of Ford Motor Company ("Ford") and has been since 2004.  Defendant Reichardt was Vice Chairman of Ford from 2001 to 2003. Defendant Reichardt is a director of Ford and has been since 1986.  Because of their long standing and entangling business and professional relationships, neither defendant Butler nor defendant Reichardt will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(i)     Each key officer and director knew of and/or directly benefitted from the wrongdoing complained of herein;

(j)     ConAgra enters into lease arrangements with Opus Corporation ("Opus") and its affiliates.  Defendant Rauenhorst is a beneficial owner, officer and director of Opus.  The lease arrangements relate to the leasing of land and buildings for ConAgra.  ConAgra occupies the buildings pursuant to long term leases with Opus and its affiliates, some of which contain various termination rights.  Leases effective in FY:04 required annual lease payments by ConAgra of $21,477,000.  Some of this amount was paid by ConAgra to Opus.  Further, Opus and its affiliates was paid $40,607,000 for construction work during FY:04 on properties leased by ConAgra from third parties.  Accordingly, demand that defendant Rauenhorst vigorously prosecute this action is futile as he has an interest in safeguarding the business arrangements between Opus and ConAgra;

(k)     As of July 26, 2004, defendants Batchelder, Bay, Buffett, Butler, Chain, Goldstone, Hayes, Jurgensen, Rauenhorst, Reichardt, Rohde, Roskens and Stinson owned millions of ConAgra shares.  Specifically, defendant Batchelder owned 10,763,000 shares; defendant Bay owned 85,600 shares; defendant Buffett owned 29,614 shares; defendant Butler owned 16,800 shares; defendant Chain owned 57,400 shares; defendant Goldstone owned 1,000 shares; defendant Hayes owned 39,448 shares; defendant Jurgenson owned 46,057 shares; defendant Rauenhorst

59

owned 66,605 shares; defendant Reichardt owned 128,800 shares; and defendant Rohde owned 1,815,332 shares, defendant Roskens owned 106,000 and defendant Stinson owned 89,600 shares. Thus, these defendants had strong motivations and incentives to participate in the improper accounting in order to effectuate a commensurate rise in ConAgra's stock price;

(l)     The Director Defendants of ConAgra, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from ConAgra's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(m)     In order to bring this suit, all of the directors of ConAgra would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(n)     The acts complained of constitute violations of the fiduciary duties owned by ConAgra's officers and directors and these acts are incapable of ratification;

(o)     Each Director Defendant authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such a suit was instituted by them;

(p)     Any suit by the current directors of ConAgra to remedy these wrongs would likely expose the Individual Defendants and ConAgra to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they

are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(q)    ConAgra has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for ConAgra any part of the damages ConAgra suffered and will suffer thereby;

(r)    If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile; and

(s)    If ConAgra's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of ConAgra.  Due to certain changes in the language of directors' and officers' liability insurance policies in the recent years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by ConAgra against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of ConAgra, there

would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause ConAgra to sue them, since they will face a large uninsured liability.

80.     Despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board of Directors failed and refused to seek to recover for ConAgra for any of the wrongdoing alleged by plaintiff herein.  This is tantamount to knowledge of the facts creating the basis, and need, for the relief sought but Defendants have not acted to achieve the relief for the Company.

81.     Plaintiff has not made any demand on shareholders of ConAgra to institute this action since such demand would be a futile and useless act for the following additional reasons:

(a)     ConAgra is a publicly held company with over 514 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

82.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.     The Individual Defendants owed and owe ConAgra fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe ConAgra the highest obligation of good faith, fair dealing, loyalty and due dare.

84.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

85.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

86.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, ConAgra has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

87.     Plaintiff on behalf of ConAgra has no adequate remedy at law.

## COUNT II

### Against All Defendants for Abuse of Control

88.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence ConAgra, for which they are legally responsible.

90.     As a direct and proximate result of the Individual Defendants' abuse of control, ConAgra has sustained significant damages.

91.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

92.     Plaintiff on behalf of ConAgra has no adequate remedy at law.

## COUNT III

### Against All Defendants for Gross Mismanagement

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of ConAgra in a manner consistent with the operations of a publicly held corporation.

95.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, ConAgra has sustained significant damages in excess of hundreds of millions of dollars.

96.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

97.     Plaintiff on behalf of ConAgra has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Waste of Corporate Assets

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.     As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused ConAgra to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

100.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

101.    Plaintiff on behalf of ConAgra has no adequate remedy at law.

## COUNT V

### Against Defendants Rohde, O'Donnell and Sklarsky for Disgorgement Under the Sarbanes-Oxley Act

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    Pursuant to Sarbanes-Oxley Act of 2002 '304, because ConAgra will restate its financial statements for fiscal 2002 through 2005 due to material noncompliance with SEC rules and

published guidance as a result of false and misleading financial statements, defendant Rohde, as ConAgra's CEO, President and Chairman, defendant O'Donnell as ConAgra's Executive Vice President and CFO, until June 2004, and defendant Sklarsky as ConAgra's Executive Vice President and CFO, since December 2004, are required to reimburse ConAgra for all bonuses or other incentive-based or equity-based compensation, received by them from ConAgra during the fiscal years 2002 through 2005.

104.    Defendants Rohde, O'Donnell and Sklarsky are also liable to plaintiffs for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of ConAgra.

## COUNT VI

### Against All Defendants for Unjust Enrichment

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of ConAgra.

107.    Plaintiff, as a shareholder and representative of ConAgra, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### REQUEST FOR RELIEF

On the foregoing basis Plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches

of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

      B.     Declaring that defendants Rohde, O'Donnell and Sklarsky are liable under the Sarbanes-Oxley Act of 2002 and requiring them to reimburse ConAgra for all bonuses or other incentive-based or equity-based compensation received by them during fiscal years 2002 through 2005 and judgment accordingly;

      C.     Awarding to ConAgra restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

      D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:    July 25, 2005

                    By:  s/ David W. Rowe
                        David W. Rowe, #19155
                        Julianne M. Spatz, #22978
                        KINSEY RIDENOUR BECKER & KISTLER, LLP
                        P.O. Box 85778
                        610 Lincoln Square
                        Lincoln, NE 68501-5578
                        (402) 438-1313
                        (402) 438-1654 (facsimile)

FARUQI & FARUQI, LLP
Nadeem Faruqi
Anthony Vozzolo
320 East 39th Street
New York, New York 10016
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

Attorneys for Plaintiff